IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*.<br>ALICIA STRICKLAND and<br>PAIGE PURCELL,<br><br>    Plaintiffs,<br><br>vs.<br><br>DRAYER PHYSICAL THERAPY INSTITUTE,<br>CHRIS FISHER,<br>JEFF FROMDAHL,<br>BRAD KEISLING,<br>MELISSA ZINK, and<br>TYRONE DELMONICO,<br><br>    Defendants. | Civil Action No. 9:13-cv-1781-SB<br><br>**FILED *IN CAMERA* AND<br>    UNDER SEAL**<br><br>**FALSE CLAIMS ACT<br>MEDICARE FRAUD**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFFS' COMPLAINT PURSUANT TO 31 U.S.C. §§ 3729-3732
OF THE FEDERAL FALSE CLAIMS ACT**

The United States of America, by and through *qui tam* relators Alicia Strickland

and  Paige Purcell ("Relators"), bring this action under 31 U.S.C. § 3729, *et seq*., ("False

Claims Act" or "FCA" or "Act") to recover all damages, penalties and other remedies

established by the False Claims Act on behalf of the United States from the named

Defendants.

## I.    Preliminary Statement

1.    This is an action to recover damages and civil penalties on behalf of the

United States of America ( "USA" or "Government") for violations of the False Claims

Act arising from false or fraudulent records, statements or claims, or any combination

thereof, knowingly made, used or caused to be made, used or presented, or any

combination thereof, by the Drayer Physical Therapy Institute ("Drayer"), its agents,

Complaint

employees, or co-conspirators, or any combination thereof, with respect to false or fraudulent claims for payment for outpatient physical therapy and rehabilitation services provided to individuals for which claims were made by Drayer to the federal Medicare Program; and Drayer knowingly using, making and presenting, or causing to use, make or present false records or statements to get false or fraudulent claims paid by the United States from Medicare Trust Funds.  The fraud and fraudulent schemes knowingly used by Drayer are known as: (1) "upcoding" of claims for payment; and (2) billing patients for skilled services when in fact the patients were treated by unlicensed physical therapy aides.  Drayer engaged in these schemes to fraudulently obtain payment for services at a higher amount than what Drayer was authorized to receive by federal statutes and Medicare/CMS rules, policies and regulations, and for services not covered by Medicare.

2.      The False Claims Act was enacted during the Civil War. Congress amended the False Claims Act in 1986 to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the False Claims Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization.  Congress intended that the amendments create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecute fraud on the Government's behalf.

3.      The False Claims Act provides that any person who knowingly presents, or causes the presentment of, a false or fraudulent claim to the Government for payment or

approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government, and attorney's fees.

4.      The Act allows any person having information about a false or fraudulent claim against the Government to bring an action for herself and the Government, and to share in the recovery.  The Act requires that the complaint be filed *in camera* and remain under seal for a minimum of 60 days (without service on the defendants during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.  As required by the Act, at 31 U.S.C. § 3730(b)(2), the Relators have provided to the Attorney General of the United States and to the United States Attorney for this District prior to filing this Complaint, a written disclosure of substantially all material evidence and information relating to the Complaint. This disclosure supports the allegations that Drayer is knowingly defrauding the Medicare Program by false and fraudulent "upcoding"[1] of claims for outpatient physical therapy services and by false and fraudulent billing for services provided by unlicensed physical therapy aides to Medicare patients as if the patients contrary to fact received skilled services from licensed physical therapists ("PTs") and physical therapist assistants ("PTAs"). Drayer engaged in these false and fraudulent billing practices in order to obtain higher payments of Medicare Trust Funds than the lower amounts to which Drayer was entitled by federal statutes and Medicare/CMS rules, policies and regulations, and to obtain payment for services not reimbursable by Medicare.

---

[1] "'Upcoding,' a common form of Medicare fraud, is the practice of billing Medicare for medical services or equipment designated under a code that is more expensive than what a patient actually needed or was provided." *United States ex rel. Bledso v. Cmty. Health Sys., Inc.,* 342 F.3d 634, 637 n.3 (6th Cir. 2003).

Complaint

5. Under Medicare, health care professionals and entities, including licensed physical therapists and operators of licensed physical therapy facilities, all have specific responsibilities to prevent false claims from being presented and are liable under the False Claims Act for their role in the submission of false claims.

6. This is an action for treble damages and penalties for each false claim and each false statement under the False Claim Act, 31 U.S.C. § 3729, *et seq*., as amended.

## II.    Parties

7. Relators are citizens of the United States, residents of Bluffton, South Carolina, licensed Physical Therapist Assistants by the State of South Carolina and former employees of Drayer at its outpatient facility located in Bluffton, South Carolina.

8. Relators bring this action on behalf of the United States pursuant to 31 U.S.C. § 3730(b)(1), and each Relator is an "original source" as defined by 31 U.S.C. § 3730(e)(4)(B).

9. Upon information and belief, Drayer is a corporation organized under the laws of the Commonwealth of Pennsylvania and is doing business in South Carolina as a foreign domesticated for-profit corporation. Drayer owns and operates over 100 outpatient physical therapy clinics ("clinics" or "centers") in the Northeast, Mid-Atlantic, and Southeast United States. Drayer opened its first center in Bel Air, Maryland in 2002, and has been operating centers in South Carolina since June 2007.

10. Defendant Jeff Fromdahl was a Drayer employee at its Bluffton center at times relevant to this Complaint. Upon information and belief, he continues to be employed by Drayer. Upon information and belief, he was and is responsible, in part, for

the management of Drayer's Bluffton center.  Upon information and belief, he is a citizen of the United States and a resident of the State of South Carolina.

11.    Defendant Brad Keisling was a Drayer employee at its Bluffton center at times relevant to this Complaint.  Upon information and belief, he continues to be employed by Drayer.  Upon information and belief, he was part of Drayer's management at its Bluffton center, and is now responsible, in part, for the management of its Hilton Head center.  Upon information and belief, he is a citizen of the United States and a resident of the State of South Carolina.

12.    Defendant Chris Fisher was a Drayer employee at its Bluffton center at times relevant to this Complaint.  Upon information and belief, he continues to be employed by Drayer.  Upon information and belief, he was and is responsible, in part, for the management of Drayer's Bluffton center.  Upon information and belief, he is a citizen of the United States and a resident of the State of South Carolina.

13.    Defendant Melissa Zink was a Drayer employee at its Bluffton center at times relevant to this Complaint.  Upon information and belief, she continues to be employed by Drayer.  Upon information and belief, she was and is responsible, in part, for the management of Drayer's Bluffton center.  Upon information and belief, she is a citizen of the United States and a resident of the State of South Carolina.

14.    Defendant Tyrone "Ty" Delmonico was a Drayer employee at its Bluffton center at most times relevant to this Complaint.  Upon information and belief, he continues to be employed by Drayer.  Upon information and belief, he is currently responsible, in part, for Drayer's corporate compliance program.  Upon information and belief, he is a citizen of the United States and a resident of the State of Pennsylvania.

Complaint

### III.    Jurisdiction and Venue

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345 and 1355, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  There have been no public disclosures of the allegations or transactions contained herein that bar jurisdiction under 31 U.S.C. § 3730(e).

16.    This Court has personal jurisdiction over Drayer pursuant to 31 U.S.C. § 3732(a) because this section authorizes nationwide service of process and because Drayer and the Individual Defendants have at least minimum contacts with the United States, and can be found, reside, transact or have transacted business in the District of South Carolina.  Drayer currently is operating outpatient physical therapy centers in Bluffton (2), Hilton Head, Columbia and Irmo, South Carolina.

17.    Venue exists in the United States District Court for the District of South Carolina pursuant to 31 U.S.C. §§ 3730(b)(1) and 3732(a) because Drayer and the Individual Defendants have at least minimum contacts with the United States, and can be found, reside, transact or have transacted business in the District of South Carolina; and 28 U.S.C. § 1391(b) in that a substantial part of the events or omissions giving rise to the claims occurred in this District and Drayer does business in this District.

### IV.    Applicable Law

**A.    Medicare**

18.    The Medicare program is a federally funded health care benefit and insurance program operating in interstate commerce designed to provide medical care to

people sixty-five (65) years of age or older, and certain others with covered disabilities or illnesses. The Medicare program is divided into two parts: Hospital Insurance (Part A) and Medical Insurance (Part B). Medicare Part A pays for inpatient care in a hospital or a skilled nursing facility. Medicare Part B pays for, among other things, physical therapy, outpatient physical rehabilitation services and diagnostic testing. This case deals with fraudulent billing practices involving Medicare Part B for outpatient physical therapy and rehabilitation services.

19.    Medicare Part B program pays eighty percent (80%) of the reasonable charge of medically necessary services provided by a licensed physical therapist or a licensed physical therapist assistant working under the supervision of a physical therapist. The patient's secondary private health insurance, Medicaid or the patients themselves are responsible for the remaining twenty percent (20%) co-payment balance.

20.    The Medicare program is prescribed by statute and federal regulations and is supervised by the United States Department of Health and Human Services through its agency, the Centers for Medicare and Medicaid Services (CMS), formerly known as the Healthcare Financing Administration (HCFA).

21.    The Medicare Part B program is administered in South Carolina by Palmetto GBA J11 Part B PCC ("Palmetto GBA"), pursuant to a contract with the United States Department of Health and Human Services. Palmetto GBA receives, adjudicates and pays claims submitted to the Medicare program from providers of medical services, including the claims of Drayer as described herein.

22.    In order to receive payment, a provider, such as Drayer, is required to submit a paper Form CMS-1500 or its electronic claim equivalent. Once received, the

Medicare program assigns each claim a claim control number and pays, denies or requests further information about the claim.

23.    Medicare claim forms require the provider to certify that the information on the claim form is truthful.

24.    Once the Medicare program reviews and adjudicates a claim, it then pays a provider by check mailed to the provider or by electronically wiring funds to the provider's designated bank account.

25.    The Medicare program requires the health care provider to describe the services rendered by using a Current Procedure Terminology ("CPT") code on patient forms.  The CPT code is an annual publication by the American Medical Association designed to provide a common classification of services for health care providers.

26.    The CPT codes typically utilized by providers of outpatient physical therapy services are set forth on Exhibit 1, attached hereto and incorporated herein by reference. Exhibit 1 shows the code number for each diagnostic test, procedure or modality typically used by a physical therapy professional; describes each diagnostic test, procedure or modality; and shows South Carolina Medicare payment rate for each diagnostic test, procedure or modality for the years 2006 to 2013.

27.    Because some CPT codes provide for higher payment rates than others, a dishonest and fraudulent health care provider can increase the total amount of its reimbursements by assigning patients to higher payment CPT codes than warranted or permitted under controlling rules, policies and regulations.  For example, CPT code 97150 (group therapeutic procedures—an untimed code) on Exhibit 1, p. 6 provided a payment rate of $18.39 **per session** for 2011 whereas CPT code 97110 (therapeutic

exercises) provided a payment rate of $28.71 **per 15-minute unit of time**.  If a provider

improperly assigned CPT code 97110 rather than CPT code 97150 on a regular basis this

would result in a significant and unwarranted windfall to the provider, and a concomitant

financial loss to the payor of the healthcare services, such as the Government under the

Medicare program.   The intentional assignment of higher paying CPT codes in order to

increase the total amount of reimbursements is a form of upcoding and fraud.

28.    The FCA provides, in pertinent part, as follows:

(a) Liability for certain acts.

(1) In general. Subject to paragraph (2), any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent
claim for payment or approval;
(B) knowingly makes, uses, or causes to be made or used, a false record or
statement material to a false or fraudulent claim;
(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F),
or (G);
…
(G) knowingly makes, uses, or causes to be made or used, a false record or
statement material to an obligation to pay or transmit money or property to
the Government, or knowingly conceals or knowingly and improperly
avoids or decreases an obligation to pay or transmit money or property to
the Government, is liable to the United States Government for a civil
penalty of not less than $ 5,500 and not more than $ 11,000, as adjusted by
the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C.
2461 note; Public Law 104-410), plus 3 times the amount of damages
which the Government sustains because of the act of that person.

(b) Definitions. For purposes of this section--
(1) the terms "knowing" and "knowingly"--
(A) mean that a person, with respect to information--
(i) has actual knowledge of the information;
(ii) acts in deliberate ignorance of the truth or falsity of the information; or
(iii) acts in reckless disregard of the truth or falsity of the information; and
(B) require no proof of specific intent to defraud;
(2) the term "claim"--
(A) means any request or demand, whether under a contract or otherwise,
for money or property and whether or not the United States has title to the
money or property, that--

Complaint

(i) is presented to an officer, employee, or agent of the United States; or
(ii) is made to a contractor, grantee, or other recipient, if the money or
property is to be spent or used on the Government's behalf or to advance a
Government program or interest, and if the United States Government--
(I) provides or has provided any portion of the money or property
requested or demanded; or
(II) will reimburse such contractor, grantee, or other recipient for any
portion of the money or property which is requested or demanded; and
(B) does not include requests or demands for money or property that the
Government has paid to an individual as compensation for Federal
employment or as an income subsidy with no restrictions on that
individual's use of the money or property;
(3) the term "obligation" means an established duty, whether or not fixed,
arising from an express or implied contractual, grantor-grantee, or licensor-
licensee relationship, from a fee-based or similar relationship, from statute
or regulation, or from the retention of any overpayment; and
(4) the term "material" means having a natural tendency to influence, or be
capable of influencing, the payment or receipt of money or property.

31 U.S.C. § 3729.

29.     Since March 23, 2010, the Social Security Act, at 42 U.S.C. § 1320a-

7k(d), has required health care providers who receive or retain federal health care

program overpayments to report and return the overpayments within 60 days of

identification of said overpayments.  A health care provider who receives or retains

federal health care program funds in violation of this provision and other similar statutes

and regulations must return such funds as overpayments.  A failure to timely return such

overpayments is subject to a reverse false claim under the FCA.

## V.    Fraudulent Conduct

30.     This action  alleges that Drayer received unwarranted windfalls in the

millions of dollars in the form of reimbursements from Medicare for 1) billing for

physical therapy  services at a higher rate than warranted (fraudulent upcoding)  and 2)

billing for skilled services that were never provided by licensed therapists (false billing).

This action further alleges that the United States Medicare Program has suffered

Complaint

significant losses in the millions of dollars as a result of Drayer's fraudulent upcoding and false billing.  The Relators seek to recover the overpayments to Drayer so that these payments can go back to the United States Medicare Trust Funds and to obtain civil penalties against Drayer.

31.    Defendant Drayer has knowingly submitted and presented materially false claims to the Medicare program, and used false records and statements to support those false claims.  All of the Defendants have knowingly presented, or caused to be presented, materially false and fraudulent claims for payment to federal health care benefit programs, specifically Medicare, in violation of 31 U.S.C. § 3729(a)(1)(A), as set forth herein.  All of the Defendants have knowingly made, used or caused to be made or used, one or more materially false records or false statements material to a false or fraudulent claim to federal health care benefit programs, specifically including Medicare, in violation of 31 U.S.C. § 3729(a)(1)(B), as set forth herein.  All of the Defendants have knowingly made, used or caused to be made or used, one or more materially false records or false statements material to an obligation to pay or transmit money or property to the federal Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the federal Government, including the federal health care benefit programs Medicare, in violation of 31 U.S.C. § 3729(a)(1)(G), as set forth herein.  All of the Individual Defendants have knowingly conspired and combined to commit, with themselves and others, and have knowingly aided and abetted each other in the commission of, violations of 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G) as more fully set forth in this Complaint, all in violation of 31 U.S.C. § 3729(a)(1)(C).

Complaint

32.     At all times relevant to this complaint, Alicia Strickland was a duly

licensed physical therapist assistant (PTA).  In 2003, Ms. Strickland began working at

Orthosport Physical Therapy, LLC (Orthosport) at its center in Hilton Head, S C and later

transferred to its Bluffton, SC center in 2006, and continued working there until

Orthosport was acquired by Drayer in June 2007.  Ms. Strickland continued to work at the

Bluffton center (now a Drayer physical therapy center) until November 30, 2011 as an

employee of Drayer.

33.     As part of her usual and customary duties as a PTA at both Orthosport and

later at Drayer, Ms. Strickland was required to designate in the patient's chart the CPT

codes for the patient services that she provided and the amount of time in 15-minute units

that she treated each patient.  The CPT codes, the number of units of treatment and the

times the treatment was started and terminated were each recorded on the patient's

"encounter form" that Drayer used as  part of the patient's chart. At the end of each day,

Ms. Strickland and the other therapists who worked for Drayer submitted the completed

encounter forms to the center's billing manager who would then use the CPT codes and

the number of units recorded on the encounter form to determine the amount that would

be billed to the patient or the patient's insurance carrier or to prepare the claim for

reimbursement that would be presented to Medicare.  Drayer presented its claims for

reimbursement to Medicare within a week of when the purported services were provided.

34.     While at Orthosport, Ms. Strickland provided physical therapy treatments

to numerous Medicare patients.  At Orthosport she was instructed that if she treated two

or more patients at the same time and each patient was receiving treatment that required

the presence of a therapist, then for Medicare reimbursement purposes, she had to use the

Complaint

CPT code for group therapeutic procedures (97150) for the Medicare patient rather than the CPT codes for one-on-one services because one-on-one treatments required the presence of a therapist.  For Medicare reimbursement purposes, a therapist (whether a PT or a PTA) was prohibited from using the CPT codes for one-on-one treatments when treating two or more patients at the same time with treatment requiring the presence of a therapist. As shown below, Drayer on almost a daily basis violated this prohibition and routinely sought and obtained reimbursement from Medicare for treatments provided by a therapist to a Medicare patient during  the same time unit that the therapist was treating other patient(s) , which treatment  should have been billed as group therapeutic procedures, but were billed at the higher reimbursement rates for one-on-one treatments.

35.    Ms. Strickland was informed that the CPT code 97150 for group billing was an untimed code.  This meant that the Medicare patient was billed for one session of group services regardless of the length of time of the session. For 2011, the South Carolina Medicare reimbursement payment rate for one session of group therapeutic procedures was $18.39.  (Ex. 1, p. 6)  In 2012, the reimbursement rate for group therapeutic procedures was $18.65/session. (Ex. 1, p. 7)

36.    Ms. Strickland was further informed that the CPT codes for one-on-one services were timed codes and were billed to Medicare based on the number of 15-minute units of time spent in providing skilled services to the patient.  For Medicare reimbursement purposes, providers billed a single 15-minute for a procedure greater than or equal to 8 minutes through and including 22 minutes.  If the duration of a single procedure is greater than or equal to 23 minutes through and including 37 minutes, then 2 units are billed; if 38 minutes to 52 minutes, then 3 units are billed and so on.  This

Complaint

procedure for counting minutes for timed CPT codes in 15-minute units is commonly

referred to as the Medicare "8-Minute rule." The 8-Minute rule dictates that in order to

bill for each additional time-based code, a provider must spend at least eight minutes of

each unit providing direct service to the patient. In other words, in order to bill for a 15

minute code, Medicare requires that the session be at least eight minutes long of

uninterrupted service. For 2011, the reimbursement rate in South Carolina for one-on-one

therapeutic exercises (CPT code 97110) was $28.71 per 15-minute unit. (Ex. 1, p. 6)   The

reimbursement rates for other time-based codes (for one-on-one treatment) are set forth

on Exhibit 1, CPT codes 97110 to 97140, and 97530 to 97542.

37.     Drayer, and its center managers, and regional vice-presidents , were aware

of the Medicare 8-Minute rule because they routinely displayed charts and reminders in

its centers describing the 8-Minute rule so that its staff would use the 8-Minute rule when

preparing the claims for reimbursement for Medicare patients. Drayer also evaluated the

performance of the PTs and PTAs in part on how well they applied the 8-Minute rule in

documenting the services they provided to Medicare patients.

38.     If in 2011 Ms. Strickland provided therapeutic exercise to a Medicare

patient for 45 minutes as part of a group, a reimbursement claim should have been

submitted to Medicare for $18.39 for the services provided to the patient.  However, if the

same Medicare patient was provided therapeutic exercises for 45 minutes on a one-on-one

basis, the claim submitted to Medicare would have been for $87.03 ($29.01/unit x 3 15-

minute units).  Medicare would have therefore been billed $68.64 ($87.03 - $18.39) more

than if the service had been billed to Medicare at the group code rate.

39.    Under CMS/Medicare regulations, rules and policies, the group billing code must be used whenever a Medicare patient is treated simultaneously with another patient, and both treatments required the presence of a therapist.

40.    Under CMS/Medicare regulations, rules and policies, neither a PT nor a PTA may bill in the same time unit for more than 1 one-on-one treatment code for services provided to the same or to different patients. As a result of CMS/Medicare regulations, rules, and procedures the maximum number of units a PT or PTA may routinely bill for one-on-one treatment during any interval of time equal to or greater than 53 minutes through 67 minutes is 4 units regardless of whether the one-on-one treatment is provided to the same or different patients.

41.    While employed at the Bluffton center by Orthosport, Ms. Strickland regularly used the CPT group billing code when she treated a Medicare patient simultaneously with one or more other patients whose treatment required the presence of a therapist. Within days of Drayer acquiring Orthosport's Bluffton physical therapy practice in June 2007, Ms. Strickland was informed at both a staff meeting and by the center manager, Brad Keisling, that Drayer did not use the group billing CPT code (code 97150) for Medicare patients. At the time these statements were made, neither the number of licensed physical therapy professionals at the Bluffton center had increased nor had the patient load per licensed physical therapy professional decreased.

42.    At all times relevant to this complaint, Paige Purcell has been a duly licensed physical therapist assistant. In 2003, Ms. Purcell (f/k/a Ms. Lurz) began working for Drayer at its physical therapy center in Bel Air, Maryland, and continued working there until 2005. As part of her usual and customary duties as a PTA at the Bel Air center

Complaint

and later at the Bluffton center, Ms. Purcell was required to designate on the patient's chart or file  the CPT codes for the  patient services that she provided and the amount of time in 15-minute units that she treated each patient. The CPT codes, the number of units of treatment and the times the treatment was started and terminated were each recorded on the patient's "encounter form" that made up part of the patient's chart. At the end of each day, Ms. Purcell and the other therapists submitted the completed encounter forms to the center's billing manager/billing staff who would then use the CPT codes and the number of units recorded on the encounter form to determine the amount that would be either billed to the patient or the patient's insurance carrier or submitted for reimbursement to Medicare.  Drayer presented its claims for reimbursement to Medicare within a week of when the purported services were provided.

43.    At the start of her employment with Drayer in 2003 and as part of her initial training regarding the use of CPT codes, Ms. Purcell was informed by Drayer's center manager, Dave Barringer, that Drayer did not use group billing codes for Medicare patients.  In  2004, Drayer's practice of not using group billing codes for Medicare patients was confirmed once again by Mr. Barringer when he informed a newly hired physical therapist, Sandy Lanning, that Drayer did not use group billing codes for Medicare patients.

44.    Ms. Purcell worked for Drayer at its Bel Air center until May 2005 when she and her husband moved to South Carolina. During the two years that Ms. Purcell worked at Drayer's Bel Air center, she frequently treated Medicare patients many of whom she treated simultaneously with other patients and not once was she instructed to use the group billing code when she provided skilled services to Medicare patients who

were treated simultaneously with other patients whose treatment required her presence. During this period, Ms. Purcell was never informed that it was a violation of CMS/Medicare regulations, rules and procedures to bill in the same time unit for more than 1 one-on-one treatment code for treatments provided to the same or to different patients.

45.    In 2005, Ms. Purcell was living in Bluffton, SC and working at a local physical therapy practice, which included treating Medicare patients.

46.    While working at this other Bluffton physical therapy center, Ms. Purcell was recruited by Tom Swazley, a representative of Drayer, to work as a physical therapist assistant at its Bluffton center.  Eventually, Ms. Purcell applied for a PTA job at Drayer's Bluffton center, was interviewed by Jeff Fromdahl and Brad Keisling, accepted the PTA job offered, and began working at the Drayer center in Bluffton in October 2007.  During the interview process and during the first few weeks of her employment at the center, Ms. Purcell asked about using group codes to treat Medicare patients because she had used these codes in her prior practice.  Ms. Purcell was informed by both Mr. Fromdahl and the center's manager, Brad Keisling, that Drayer did not need to use group billing codes when it billed for services provided to Medicare patients because it had sufficient staff.

47.    During the time that they were employed at Drayer's Bluffton center, both Relators were informed by the center managers that they were to use only the one-on-one codes set forth on Exhibit  1 and not the group billing code for all patients, including Medicare patients.  As instructed by the center managers, the Relators during the course of their employment at Drayer never utilized group billing CPT codes for Medicare patients even though they routinely treated Medicare patients simultaneously with other

Complaint

patients whose treatment required the presence of a therapist. Rather, the Relators only utilized one-on-one billing codes for Medicare patients whose treatment required the presence of a therapist and who were treated simultaneously with other patients, as directed by Drayer.

48.     During their employment with Drayer, Medicare patients averaged approximately five (5) fifteen-minute units of treatment per visit.  During these visits, Medicare patients typically were billed for four (4) units of one-on-one therapeutic procedures and the balance of the visit they received therapy that did not require the presence of a therapist. In providing therapeutic procedures, Relators typically utilized the following CPT codes for Medicare patients:

> 80% of the Time Medicare Patients Were Billed the following CPT Codes:
>
> 1 unit of 97140 (Manual Therapy)
> 2 units of 97530 (Therapeutic Activities)
> 1 unit of 97110 (Therapeutic Exercises)
>
> 20% of the Time Medicare Patients Were Billed the following CPT Codes:
>
> 2 units of 97530 (Therapeutic Activities)
> 2 units of 97110 (Therapeutic Exercises)

The reimbursement rates for these CPT codes in 2011 ((Ex. 1, p. 6) were as follows:

> 97140          $27.06/unit
> 97530          $31.29/unit
> 97110          $28.71/unit

The average amount that Relators should have billed Medicare in 2011 for these services would have been:

> 80% x (1 unit of 97140 @ $27.06/unit) + (2 units of 97530 @ $31.29/unit) + (1 unit of 97110 @ $28.71) =     $94.68
>
> 20% x (2 units of 97530 @ $31.29/unit) + (2 unit of 97110 @ $28.71) =     $24.00

Complaint

The average amount that Medicare was billed by Drayer for each visit by a Medicare patient in 2011 was approximately $118.68 ($94.68 + $24.00). The average amount that Medicare was billed by Drayer in 2011 for each unit of one-on-one service was approximately $29.67 ($118.68/4 units).  If the 2012 reimbursement rates are used (Ex. 1, p. 7)   the average amount billed Medicare for each unit of one-on-one services was approximately $30.10.

49.     Shortly after Relators began working at the Bluffton center until the time they left their employment (Strickland in November 2011, Purcell in February 2012), both Relators repeatedly complained to Melissa Zink, Bluffton's office manager, and to Brad Keisling and Chris Fisher (each who served as Bluffton's center manager at various times) that too many patients were scheduled for treatment each day; that multiple patients who required the presence of a therapist were being scheduled to be treated at the same time; and that the quality of patient care suffered because PTs and PTAs could not provide patients with the one-on-one time they required.

50.     Additionally, the Relators repeatedly complained to the various center managers that unlicensed aides were treating patients who were then billed as if they had received skilled services from a therapist.

51.     CMS and Medicare billing guides and regulations specifically state that services provided by an unlicensed aide, even if under the supervision of a therapist, are not therapy services in an outpatient setting and are not reimbursable by Medicare.  In contrast, the services of a physical therapist assistant are reimbursable by Medicare provided the physical therapist assistant is under the direct supervision of a physical therapist.

52.    Drayer's response to the numerous complaints by Relators about over scheduling patients for the same time period, and patients being treated by unlicensed aides was either to ignore the complaints; inform the Relators that the scheduling of patients was done in accordance with Drayer's corporate policies; or that the center had sufficient licensed bodies to treat the patient load.

53.    As a matter of established corporate policy, Drayer routinely scheduled multiple patients to be seen by the same therapist at the same time for one-on-one physical therapy services. Many of these patients were Medicare patients whose treatment required the presence of a therapist. This policy of booking patients simultaneously for one-on-one treatment is reflected in the daily patient schedules maintained by Drayer at its centers. The daily schedules listed the patients to be seen for that day, identified the PT who would treat the patient, and stated the time of the patient's scheduled visit. PTAs were not listed on the daily schedules. Rather, PTAs were assigned to specific PTs and treated patients under the direct supervision of the PT.  The only daily schedules that Relators saved from the Bluffton center are attached hereto in redacted form as Exhibit 2, with patient's initials substituted for patient's name.  Schedules were only made for PTs because PTAs were assigned to work with specific PTs. The Relators were assigned to work with different PTs during their employment at the Bluffton center. During the time period represented by the schedules attached as Exhibit 2, the Relators were regularly assigned to work with Chris Fisher, PT.  Drayer's records will have all of the daily schedules for all of the PTs that worked at Bluffton during the period that Relators worked as PTAs at the Bluffton center, and will further document Drayer's policy of

booking Medicare patients at the same time for what should have been one-on-one

treatment.

54.    Based on their personal review of the schedules attached as Exhibit 2, the

Relators assert the following:

July 18, 2011  (Ex. 2, p. 2)    PT:  Chris Fisher        PTA:   Alicia Strickland
7:00 a.m.    4 Medicare Patients & 1 New Patient
7:30 a.m.    1 Medicare Patient & 1 Commercial Patient

Between the hours of 7:00 a.m. and 8:00 a.m., Ms. Strickland (PTA) treated 5 Medicare
patients  and 1 commercial patient, and Chris Fisher (PT) treated 1 new patient.  The
typical patient visit, including Medicare patient, was billed for four (4) 15-minutes units
of one-on-one therapy per hour.  New patients are seen by the PT who prepares the initial
Plan of Care. Typically, the first visit for a new patient takes one hour and while the PT is
evaluating the new patient the PTA provides skilled services to the other patients. Every
Medicare patient seen by Ms. Strickland while employed at Drayer was billed for one-on-
one services as she had been instructed to do even though many of the Medicare patients
were treated simultaneously for treatment that required the presence of a therapist.

Per Drayer's billing practices, during the one hour between 7:00 and 8:00 a.m., Medicare
was billed for 4 units of one-on-on therapy for each of the 4 patients who were seen at
7:00 a.m. (a total of 16 units)  and 2 units of one-on-one therapy for the patient who was
seen at 7:30 a.m., even though only one therapist (Ms. Strickland) treated these 5
Medicare patients. Medicare was billed for a total 18 units or 4.5 hours of one-on-one
time during a one-hour period.   In this example, Medicare was overbilled for at least 14
units or for $415.38 (14 units x $29.67/unit) in this one-hour period alone.

July 20, 2011  (Ex. 2, p. 4)    PT:  Chris Fisher        PTA:   Alicia Strickland
7:00 a.m.    4 Medicare Patients
7:30 a.m.    1 Medicare Patient & 1 Commercial Patient

Between the hours of 7:00 a.m. and 8:00 a.m., Ms. Strickland and the PT treated 5
Medicare patients and 1 commercial patient. Following Drayer's corporate billing
procedures, each Medicare patient was billed for one-on-one services.   Assuming each
Medicare patients was billed at the rate of only four units of one-on-one time, then for the
one hour between 7:00 and 8:00 a.m. Medicare was billed for 18 units or 4.5 hours of
one-on-one time.   Again, Medicare was overbilled for 14 units or for $415.38 in this one-
hour period.

August 2, 2011  (Ex. 2, p. 9)    PT:  Chris Fisher        PTA:   Alicia Strickland
9:00 a.m.    1 Medicare Patient
9:30 a.m.    1 Medicare Patient
2:30 p.m.    1 Medicare Patient

3:00 p.m.          1 Medicare Patient

Ms. Strickland was treating patients by herself on this date because Chris Fisher was out. Each Medicare patient seen this day was billed for one-on-one services per Drayer billing policy even though Ms. Strickland was seeing multiple patients at the same time.  On this date, Medicare was billed 16 units of one-on-one services when it should have been billed for 4 group therapeutic services. Medicare was overbilled at least $401.16 (16 units x $29.67 – 4 group sessions x $18.39) during these periods.

February 1, 2012 (Ex. 2, pp. 40-41)    PT:  Chris Fisher          PTA:    Paige Purcell
8:30 a.m.          2 Medicare Patients
9:00 a.m.          2 Medicare Patients

Between the hours of 8:30 a.m. and 9:30 a.m. 4 Medicare patients were treated by Ms. Purcell (PTA) and Mr. Fisher (PT). Per Drayer's corporate billing practices, each patient was billed for one-on-one services. Assuming that each Medicare patient was billed at the rate of only 4 units of one-on-one services, then for the one hour between 8:30 a.m. and 9:30 a.m., Medicare was billed 12 units of one-on-one time when it should have been billed for 4 group therapeutic services. During this one-hour period, Medicare was overbilled $286.60 (12 units x $30.10 – 4 sessions x $18.65/session).

2:00 p.m.          2 Medicare Patients
2:30 p.m.          2 Medicare patients

As noted at 2:00 p.m. Ms. Purcell was "out" (on schedule "out tana/paige"--Tana, PT Aide and Paige, PT Assistant, were in meeting). This would have left Mr. Fisher  to treat 4 Medicare patients between 2:00 p.m. and 3:00 p.m. Assuming that each patient was billed only 4 units of one-on-one services, Medicare was billed for 12 units hours when it should have been billed for 4 group therapeutic services. Thus, Medicare was overbilled $286.60 during this one-hour period.

February 10, 2012 (Ex. 2, pp. 48-49)   PT:  Chris Fisher        PTA:  Paige Purcell
8:00 a.m.          2 Commercial Patients & 1 Medicare Patient
8:30 a.m.          2 Medicare Patients & 1 New Patient

Between the hours of 8:00 a.m. and 9:30 a.m. if Mr. Fisher (PT) was evaluating the new patient at 8:30 a.m. that would have left Ms. Purcell to treat 3 Medicare patients in addition to 2 Commercial patients. Per Drayer's billing policy, each Medicare patient would have been billed for one-on-one service. Assuming each Medicare patient was billed at the rate of only 4 units of one-on-one services, then Medicare was billed 12 units or 3 hours of one-on-one services in a 90 minute period during which Ms. Purcell was treating multiple patients.  Medicare should have been billed for only 3 group therapeutic services.  Instead, Medicare was overbilled for at least $305.25 during this 90 minute period.

12:00 p.m. 3 Medicare Patients

12:30 p.m. 2 Medicare Patients & 1 Commercial Patient

Between the hours of 12:00 p.m. and 1:30 p.m. Medicare was billed for at least 20 units or 5 hours of one-on-one services in a 90 minute period when multiple patients requiring the presence of a therapist were being treated at the same time. Medicare should have been billed for only 5 group therapeutic services. In other words, Medicare was overbilled for at least $508.75 during this 90 minute period.

1:00 p.m. 2 Medicare Patients
1:30 p.m. 3 Medicare Patients

Between 1:00 p.m. and 2:30 p.m. Medicare was billed 20 units or 5 hours of one-on-one services when multiple patients requiring the services of a therapist were treated at the same time. Medicare should have been billed for only 5 group therapeutic services. Again, Medicare was overbilled for at least $508.75 during this 90 minute period.

55.     The examples in Paragraph 54 involved upcoding of Medicare patients who were scheduled to be seen by one specific physical therapist (Chris Fisher) at the Bluffton center.  The Bluffton center typically employed 3-4 physical therapists per day, with schedules similar to Chris Fisher's.  Each of these other physical therapists treated Medicare patients who required the services of a therapist at the same time that they were treating other patients. Pursuant to Drayer's billing practices and policies, each of these other physical therapists upcoded Medicare by using CPT codes for one-on-one services rather than using the CPT code for group billing.  As a result of its corporate billing practices and policies, Drayer overbilled Medicare not only for the Medicare patients treated by Chris Fisher, but for the Medicare patients treated by all of its PTs and PTAs employed at the Bluffton center and its other centers as well.

56.     As shown in Paragraph 54, above, Medicare patients were routinely scheduled for treatment at the same time that PTs or PTAs were treating other patients. The Relators and other PTs and PTAs divided their attention among all the scheduled patients, providing each of them only brief, intermittent personal contact.    At no time

during their employment with Drayer did the Relators provide therapeutic procedures during separate time intervals to Medicare patients who had been scheduled at the same time as other patients.  Notwithstanding this intermittent personal contact and lack of separate time intervals, Drayer required the Relators and other PTs and PTAs to use only CPT codes for one-on-one treatment for Medicare patients that required the presence of a physical therapist. One-on-one treatment precludes treating any other patient at the same time that requires the presence of a therapist. If multiple patients who require the presence of a therapist are treated at the same time, then CMS and Medicare rules require that the treatment be coded as group therapeutic procedures.  Contrary to CMS and Medicare rules, Drayer never billed Medicare for any group therapeutic procedures during the time that Relators were employed by Drayer.

57.     Based on Relators actual work experience at Drayer centers and their knowledge of Drayer's billing practices and procedures, Relators aver that Drayer violated CMS/Medicare regulations, rules and policies on almost a daily basis by upcoding Medicare patients by utilizing one-on-one CPT codes when in fact Medicare patients were treated simultaneously with other patients requiring the presence of a therapist.  In other words, there were simply not enough therapists at Bluffton on a daily basis, and not enough hours in the day, for Drayer to code all of the treatment provided to Medicare patients requiring the presence of a therapist as one-on-one treatment.

58.     Drayer was aware of CMS/Medicare's requirement to use group coding when treating Medicare patients simultaneously with other patients.  Drayer's center managers and regional vice presidents for the Bluffton and Hilton Head centers had used group billing in their practices prior to joining Drayer, and knew that group codes had to

Complaint

be used when a Medicare patient was treated simultaneously with one or more other patients requiring the presence of a therapist.  Drayer, through both the CMS and the American Physical Therapy Association, was provided coding interpretations and billing scenarios illustrating when group billing and one-on-one billing were appropriate.  Drayer even evaluated its staff on the use of one-on-one billing.   Although Drayer knew of the requirements to use a group billing CPT code when a Medicare patient requiring the services of a therapist was treated at the same time with one or more other patients requiring the services of a therapist, it deliberately, knowingly and fraudulently instructed its staff to overbill Medicare by ignoring the group billing requirements and use only the one-on-one CPT billing codes.

59.     The difference between billing for services based on a group CPT code and on one-on-one CPT code is significant.  Exhibit 3, attached hereto and incorporated herein by reference, is the Key Indicator Report for the Bluffton Center for the week of August 12, 2011, the only report that is available to the Relators at this time.  This report shows that the average units (15-minute units) billed per patient visit for that week ranged from 4.65 units to 4.75 units (rather than the 4 unit estimate Relators used in Paragraph 48, above) and that the average charge per patient visit ranged from $164.54 to $167.85.  If a Medicare patient should have been billed for a group visit of $18.39 (per Exhibit 1, p 6), but instead was improperly charged on the average for 4.65 units of one-on-one services at an average cost of $164.54 per visit (per Exhibit 3), then this would represent a wrongful over-billing of $145.88 ($164.58 - $18.39) per patient visit by Drayer.

60.     Based on the Relators review of 12 randomly selected patient schedules for 3 or more PTs for Bluffton center from 2011 and 2012, they have determined that at least

37.75% of the weekly billable visits were Medicare patients. (Ex. 2, pp. 2-4, 8-9, 11, 13, 24-25, 27, 29-30, 35-36, 40-41). Using the only Key Indicator report in their possession, Exhibit 3, the weekly billable visits seen for the week ending August 12, 2011 were 278 visits, of which 37.75% or 105 billable visits seen would have been Medicare patients. Based on Relators actual work experience at the Bluffton center, 278 patient visits per week was typical for the Bluffton center in 2011. For purposes of determining the amount of fraudulent overcharges, Relators have reduced the 105 weekly billable Medicare visits seen to 100 weekly billable visits.

61.    Relators have also reviewed the patient schedules for July 18-20, 2011 and August 1-2, 2011 to determine the number of Medicare patients who were billed for one-on-one services when they were treated simultaneously with other patients requiring the presence of a therapist and should have been group billed. (Ex. 2, pp. 2-4, 8-9).  Based on this review, Relators have determined that 81% of the Medicare patients were wrongfully upcoded and billed for one-on-one services when they should have been group billed.

62.    Based on Relators review of Drayer's patient schedules and the one Key Indicator report, Relators have determined that 81% of the 100 weekly billable Medicare visits were improperly billed as a result of Drayer's policies that caused Medicare patients to be wrongfully upcoded.  Using the 2011 payment schedule for South Carolina (Ex. 1, p 6) and the CPT codes for one-on-one skilled services used by Drayer for billing Medicare patients (¶ 48), Medicare in 2011 was fraudulently overcharged  as a result of Drayer's fraudulent upcoding in the approximate amount of  $8,123.49 per week or $422,421.48 per year at the Bluffton center alone.  Exhibit 4 attached hereto and incorporated herein

sets forth how Relators calculated the weekly and annual amount fraudulently

overcharged by Drayer.

     63.     In addition to defrauding Medicare by upcoding, Drayer has also

defrauded Medicare by billing Medicare for services provided by unlicensed aides.

Examining the patient schedules for PTs who were only assisted by unlicensed aides and

who did not use PTAs demonstrates this fraudulent billing by Drayer for skilled services

provided by unlicensed aides. For example, Ty Delmonico was a PT at the Bluffton center

who only used unlicensed aides.  Under CMS/Medicare regulations, services provided by

unlicensed aides, even if under the supervision of a therapist, are not therapy services in

the outpatient setting and are not covered by Medicare. Thus, Mr. Delmonico working

with an aide could only routinely bill a total of 8 hours (32 15-minute units) in an 8 hour

work day. Based on the Relators' review of a sample of Mr. Delmonico's patient

schedules for four days and their knowledge of Drayer's billing practices and procedures,

they make the following assertions:

August 10, 2011  (Ex. 2, p. 12)

Of 20 patients scheduled, 9 were Medicare patients (45% of patients)
Each Medicare patient was scheduled at a time that Mr. Delmonico was treating
other patients
Each Medicare patient was billed for one-on-one skilled services
Each Medicare patient was treated for a minimum of four 15-minute units of time
In an 8 hour day, Mr. Delmonico could provide four 15-minute units of time to
8 patients, half of whom (4) would be Medicare patients
If 9 Medicare patients were scheduled and 1 canceled or was a no show (c/ns)
(Key Indicator Report shows c/ns = 9.9%), then out of 8 Medicare patients seen
Mr. Delmonico could treat 4 of the Medicare patients one-on-one and the
remaining 4 would have been billed for services provided by an aide.
Medicare was billed at a minimum for 16 units of skilled one-on-one services
(4 patients x 4 units/patient) which were not provided
Medicare was overbilled at least $474.72 (16 units x $29.67) during this day

January 16, 2012   (Ex. 2, pp. 24-25)

Complaint

Of 24 patients scheduled, 12 were Medicare patients (50% of patients)
Each Medicare patients was scheduled at a time that Mr. Delmonico was treating other patients
Each Medicare patient was billed for one-on-one skilled services
Each Medicare patient was treated for a minimum of four 15-minute units of time
In an 8 hour day, Mr. Delmonico could provide four 15-minute units of time to 8 patients, half of whom (4) would be Medicare patients
If 12 Medicare patients were scheduled and 2 are (c/ns), then out of 10 Medicare patients seen Mr. Delmonico could treat 4 of the Medicare patients one-on-        one and the  remaining 6 would have been billed for services provided by an aide.
Medicare was billed at a minimum for 24 units of skilled one-on-one services (6 patients x 4 units/patient) which were not provided
Medicare was overbilled at least $722.40 (24 units x $30.10) during this day

January 18, 2012   (Ex. 2, p. 27)

Of 18 patients scheduled, 9 were Medicare patients (50% of patients)
Each Medicare patients was scheduled at a time that Mr. Delmonico was treating other patients
Each Medicare patient was billed for one-on-one skilled services
Each Medicare patient was treated for a minimum of four 15-minute units of time
In an 8 hour day, Mr. Delmonico could provide four 15-minute units of time to 8 patients, half of whom (4) would be Medicare patients
If 9 Medicare patients were scheduled and 1 is (c/ns), then out of  8 Medicare patients seen Mr. Delmonico could treat 4 of the Medicare patients one-on-        one and the  remaining 4 would have been billed for services provided by an aide.
Medicare was billed at a minimum for 16 units of skilled one-on-one services (4 patients x 4 units/patient) which were not provided
Medicare was overbilled at least $481.60 (16 units x $30.10) during this day

February 7, 2012   (Ex. 2, pp. 42-43)

Of 20 patients scheduled, 12 were Medicare patients (60% of patients)
Each Medicare patients was scheduled at a time that Mr. Delmonico was treating other patients
Each Medicare patient was billed for one-on-one skilled services
Each Medicare patient was treated for a minimum of four 15-minute units of time
In an 8 hour day, Mr. Delmonico could provide four 15-minute units of time to 8 patients, 60% of whom (5) would be Medicare patients
If 12 Medicare patients were scheduled and 2 are (c/ns), then out of 10 Medicare patients seen Mr. Delmonico could treat 5 of the Medicare patients one-on-        one and the  remaining 5 would have been billed for services provided by an aide.
Medicare was billed at a minimum for 20 units of skilled one-on-one services (5 patients x 4 units/patient) which were not provided
Medicare was overbilled at least $602.00 (20 units x $30.10) during this day

Complaint

64.      Based on the Relators review of Mr. Delmonico's patient schedule for the four days above, Medicare was fraudulently billed for a total of 70 units of skilled services that were not provided by a licensed therapist, or on average, Medicare was overbilled 17.5 units per day for treatment by unlicensed aides. At an average price of $29.67/unit in 2011 (Ex. 4), Drayer fraudulently billed Medicare $2,596.12 per week or $134,998.00 per year for Medicare patients treated by Mr. Delmonico's unlicensed aide.

65.      In addition to Mr. Delmonico, other PTs used unlicensed aides and Medicare was billed at times for these unlicensed aides. Based upon Relators' knowledge of Drayer's billing practices and procedures, the average number of Medicare patients seen at Bluffton on a weekly basis and the number of licensed therapists and unlicensed aides, they aver that an additional $250,000 per year was fraudulently billed Medicare for skilled services that were not provided by licensed therapists.

66.      On information and belief, the fraudulent billing and upcoding that has taken place at the Bluffton center is not unique to Bluffton, but is based on policies and practices of Drayer that are system-wide. Upon information and belief, each of Drayer's more than 100 centers utilizes the same billing practices and procedures that the Bluffton center uses. Each of these centers are submitting the same type of false and fraudulent claims and information to Medicare for hundreds, if not thousands of Medicare visits, per year per center amounting to millions of dollars per center for fraudulent reimbursements that were obtained by or caused by Drayer's knowingly false and fraudulent billing practices.

67.      The facts, as set forth herein, clearly demonstrate that Drayer, through its officers, center managers and regional vice presidents, acted knowingly as defined in 31

U.S.C. § 3729(b) in that they acted in reckless disregard of the truth or falsity of the information, acted in deliberate ignorance of the truth or falsity of the information, or acted with actual knowledge that the information Drayer provided on the claims it submitted or caused to be submitted and/or presented to CMS and Medicare officials for payment were false. The facts alleged herein clearly demonstrate that Drayer, through its officers, center managers and regional vice presidents, knew that they were fraudulently upcoding or false coding Medicare claims because they were submitting claims for physical therapy services provided to Medicare eligible patients on a group basis while billing the Medicare program as if the services were provided on a one-to-one basis thereby enabling Drayer to bill Medicare at a higher rate for the services provided than was warranted by federal statutes and Medicare/CMS regulations, rules and policies. Further, the facts alleged herein clearly demonstrate that Drayer, through its officers, center managers and regional vice presidents, knew that they were fraudulently billing Medicare eligible patients for services provided by unlicensed physical therapy aides thereby enabling Drayer to bill Medicare for services that were never provided by a licensed physical therapist professional. These facts demonstrate that Drayer's fraudulent upcoding and false billing were not inadvertent errors, but were a knowing and systemic pattern of causing the presentment of false claims, and using false statements and records containing fraudulently upcoded and false coded claims for payment by CMS and Medicare officials.

68.     Defendants knowingly made materially false records and false statements in support of such false and fraudulent claims to Medicare material to an obligation to pay or transmit money or property to the United States Government, or knowingly and

Complaint

fraudulently concealed and, upon information and belief continue to knowingly and fraudulently conceal an obligation to pay or transmit money or property to the United States Government, or knowingly, fraudulently and improperly avoided or decreased, and continue to knowingly, fraudulently and improperly avoid and decrease, an obligation to pay or transmit money or property to the United States Government.

69.     The Defendants' foregoing materially false records or false statements include, but are not limited to, Medicare enrollment applications and certifications, federal health care benefit program provider agreements and certifications, patient charts, patient encounter forms, EMRs, EHRs, physicians orders, plans of care, physician consultation requests, physician referral orders, daily therapy schedule time sheets, and express and implied certifications and representations in the claims for payment, i.e., CMS Form 1500 and its electronic equivalent (X12 837).

70.     The materiality of the falsity of the claims Drayer caused to be presented for payment by CMS and Medicare officers and employees and the false statements and records Drayer made and used are for the very purpose of presenting the claims to CMS and Medicare for payment was for CMS and Medicare to rely on the information submitted in the claims in order to pay the claims at an amount based on the presumed to be truthful information required to be submitted by Drayer adhering to the requirements of the federal statutes and Medicare/CMS regulations, rules and policies. However, Drayer falsified the information stated in its claims and submissions to CMS  and Medicare for the purpose of getting greater amounts of Medicare Trust Funds than the amounts to which they were entitled by federal statutes and Medicare/CMS regulations, rules and policies to receive for the out-patient physical therapy services that it actually

Complaint

provided to Medicare eligible patients. Therefore, Drayer's false statements and records were material, and knowingly and fraudulently made.

71.    Drayer, from a date on or before July 1, 2006 to the present, knowingly (as defined in 31 U.S.C. § 3729(b)) submitted or caused to be submitted to Medicare reimbursement claims that were based upon violations of the Federal False Claims Act in violation of 31 U.S.C. § 3729 causing substantial damages and loss to the United States' Medicare program.

72.    As a result of Drayer's false and fraudulent claims and schemes as described above, the Government was directly damaged by paying much higher payments for out-patient physical therapy services than the lower amounts to which Drayer was entitled by federal statutes and Medicare/CMS regulations, rules and policies to receive.

73.    The Government, unaware of the falsity of the claims made or caused to be made by Drayer, paid and continues to pay claims that would not be paid or not be paid at higher amounts but for Drayer's false and fraudulent misrepresentations.

74.    The Relators estimate that Drayer's knowingly false and fraudulent conduct resulted in the Government paying in excess of more than two million dollars at the Bluffton center alone for the period from July 1, 2006 to the present, and a loss of more than two hundred million dollars for the same period for all of Drayer's centers.

**COUNT I**
**DRAYER'S VIOLATION OF THE FALSE CLAIM ACT BY**
**CAUSING PRESENTATION OF FALSE OR FRAUDULENT CLAIMS**
**SECTION 3729(a)(1)(A) CLAIM**

75.    This is a civil action by Plaintiffs, United States of America, *ex rel.* Relators, Alicia Strickland and Paige Purcell, on behalf of the United States and on behalf

of the Relators, against Drayer Physical Therapy Institute, under the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

76.     Relators reallege and incorporate by reference the above Paragraphs as if fully set forth herein.

77.     Drayer, from a date on or before July 1, 2006 to the present, knowingly (as defined in 31 U.S.C. § 3729(b)) submitted to officers, employees, agents or contractor of the United States Department of Health and Human Services false or fraudulent claims for payment or approval, resulting in great financial loss to the United States of America.

78.     By virtue of the acts described above, Drayer has falsely certified its compliance with all applicable statues, rules, regulations and procedures in connection with the submission of Medicare reimbursement forms from at least July 1, 2006 (and Bluffton since July 1, 2007) through the present.

79.     Each claim submitted by and each reimbursement or payment received by Drayer that was a result of a false or fraudulent record or statement and/ or a false or fraudulent claim for payment constitutes a separate violation of the FCA and entitles the United States to recover a civil penalty of $5,500 to $11,000 for each violation.

80.     The Relators estimate that Drayer's knowingly false and fraudulent conduct resulted in the Government paying in excess of an extra two hundred million dollars since July 1, 2006 for false claims prohibited by the FCA statutes, which constitute actual damages, without regard to fines or civil penalties.

81.     As a result of Drayer's actions and conduct as set forth in this Count, the United States, on information and belief, has suffered actual damages in excess of two hundred million dollars, all in violation of 31 U.S.C. § 3729(a)(1)(A).

Complaint

**COUNT II**

**DRAYER'S VIOLATION OF THE FALSE CLAIM ACT BY CAUSING A FALSE RECORD OR STATEMENT TO BE MADE OR USED TO RESULT IN A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED BY THE GOVERNMENT.**
**SECTION 3729(a)(1)(B) CLAIM**

82.     This is a civil action by Plaintiffs, United States of America, *ex rel.* Relators, Alicia Strickland and Paige Purcell, on behalf of the United States and on behalf of the Relators, against Drayer Physical Therapy Institute, under the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

83.     Relators reallege and incorporate by reference the above Paragraphs as if fully set forth herein.

84.     Drayer, from a date on or before July 1, 2006 to the present, knowingly (as defined in 31 U.S.C. § 3729(b)) caused to be submitted to Medicare reimbursement claims that were based upon violations of the Federal False Claims Act in violation of 31 U.S.C. § 3729 causing substantial damages and loss to the United States' Medicare program.

85.     By virtue of the acts described above, Drayer has falsely certified its compliance with all applicable statues, rules, regulations and procedures in connection with Medicare reimbursement forms that Drayer caused to be submitted from at least July 1, 2006 (and Bluffton since July 1, 2007) through the present.

86.     Each claim that Drayer caused to be submitted and each reimbursement or payment that Drayer caused to be received was a result of a false or fraudulent record or statement and/ or a false or fraudulent claim for payment and constitutes a separate violation of the FCA and entitles the United States to recover a civil penalty of $5,500 to $11,000 for each violation.

87.     The Relators estimate on information and belief that Drayer's knowingly false and fraudulent conduct resulted in the Government paying in excess of an extra two hundred million dollars since July 1, 2006 for false claims prohibited by the FCA statutes, which constitute actual damages, without regard to fines or civil penalties.

88.     As a result of Drayer's actions and conduct as set forth in this Count, the United States has suffered actual damages in excess of two hundred million dollars, all in violation of 31 U.S.C. § 3729(a)(1)(B).

## COUNT III
## CONSPIRACY TO VIOLATE THE FALSE CLAIM ACT.
## SECTION 3729(a)(1)(C) CLAIM

89.     This is a civil action by Plaintiffs, United States of America, *ex rel.* Relators, Alicia Strickland and Paige Purcell, on behalf of the United States and on behalf of the Relators, against the Individual Defendants, under the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

90.     Relators reallege and incorporate by reference the above Paragraphs as if fully set forth herein.

91.     In violation of 31 U.S.C. § 3729(a)(1)(C), all of the Individual Defendants knowingly combined and conspired to violate sections of the FCA, including, but not limited to, 31 U.S.C. § 3729(a)(1)(A), 31 U.S.C. § 3729(a)(1)(B) and 31 U.S.C. § 3729(a)(1)(G) as set forth above.

92.     In a conspiracy and combination and in furtherance thereof, the Individual Defendants knowingly presented, or caused to be presented, and continue to present or cause to be presented, materially false and fraudulent claims for payment or approval to the United States – i.e., the foregoing false and fraudulent claims for payments from

Medicare -- in violation of 31 U.S.C. § 3729(a)(1)(A), and, upon information and belief,

continue to combine and conspire to violate the foregoing sections of the FCA.

93.     In a conspiracy and combination and in furtherance thereof, the Individual

Defendants knowingly made, used or caused to be made or used, and upon information

and belief continue to make, use and cause to be made or used, materially false records or

false statements material to the foregoing false or fraudulent claims to get these false or

fraudulent claims paid and approved by the United States, in violation of 31 U.S.C. §

3729(a)(1)(B).

94.     In a conspiracy and combination and in furtherance thereof, the Individual

Defendants knowingly made, used or caused to be made or used materially false records

or false statements, and upon information and belief continue to knowingly make, use or

cause to be made false records or false statements, material to an obligation to pay or

transmit money or property to the United States Government, or knowingly concealed and

upon information and belief continue to conceal an obligation to pay or transmit money or

property to the United States Government, or knowingly, fraudulently and improperly

avoided or decreased, and upon information and belief continue to knowingly,

fraudulently and improperly avoid and decrease, an obligation to pay or transmit money

or property to the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

95.     During the conspiracy and combination and in furtherance thereof, the

conspirators acted knowingly to have the foregoing false and fraudulent claims,

statements, and records to be made, used and/or presented, or acted with reckless

disregard or deliberate ignorance of whether or not the claims, statements and/or records

were false and fraudulent, and, upon information and belief, continue to do so.

Complaint

96.     As a direct and proximate result of the foregoing combination and conspiracy by, between and among all of the Individual Defendants, who each aided and abetted the other Individual Defendants in furtherance of the conspiracy, and committed overt acts in furtherance of the conspiracy with each false and fraudulent claim submitted to the federal government, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT IV**
**REVERSE FALSE CLAIMS UNDER THE FALSE CLAIM ACT.**
**SECTION 3729(a)(1)(G) CLAIM**

97.     This is a civil action by Plaintiffs, United States of America, *ex rel.* Relators, Alicia Strickland and Paige Purcell, on behalf of the United States and on behalf of the Relators, against Drayer Physical Therapy Institute, under the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

98.     Relators reallege and incorporate by reference the above Paragraphs as if fully set forth herein.

99.     Defendant Drayer knowingly made, used or caused to be made or used false records or false statements, and upon information and belief continues to knowingly make, use or caused to be made false records or false statements, material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed and upon information and belief continue to conceal an obligation to pay or transmit money or property to the United States Government, or knowingly and improperly avoided or decreased, and upon information and belief continue to knowingly

and improperly avoid and decrease, an obligation to pay or transmit money or property to the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

100.    These said false records or statements were presented, and upon information and belief continue to be presented, with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

101.    As a direct and proximate result of these knowingly false records or false statements by the Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## A.    REQUESTS AND PRAYER FOR RELIEF

**WHEREFORE,** the Relators, on behalf of the United States of America, demand that judgment be entered in their favor and against Defendant Drayer Physical Therapy Institute and/or the Individual Defendants, jointly and severally, for the amount of damages to the United States arising from Drayer's false or fraudulent claims, records or statements as follows:

1.    On Count I for treble the amount of the United States' damages, plus civil penalties of not more that Eleven Thousand Dollars ($11,000.00) and not less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim presented or caused to be presented.

2.    On Count II for treble the amount of the United States' damages, plus civil penalties of not more that Eleven Thousand Dollars ($11,000.00) and not less than Five Thousand Five Hundred Dollars ($5,500.00) for each false statement made or caused to be made.

Complaint

3.      On Count III for treble the amount of the United States' damages, plus civil penalties of not more that Eleven Thousand Dollars ($11,000.00) and not less than Five Thousand Five Hundred Dollars ($5,500.00) for each false statement made or caused to be made.

4.      On Count IV for treble the amount of the United States' damages, plus civil penalties of not more that Eleven Thousand Dollars ($11,000.00) and not less than Five Thousand Five Hundred Dollars ($5,500.00) for each false statement made or caused to be made.

5.      Recoupment to the United States Treasury of all Medicare Trust Funds paid to Drayer in excess of the lesser amounts to which Drayer was entitled by federal statutes and Medicare/CMS regulations, rules and policies.

6.      All fees and costs of this civil action.

7.      For such other and further relief as the Court deems just and equitable.

8.      Further, the Relators, on their behalf, request that they receive thirty percent (30%), (twenty- five percent (25%) if the United States intervenes and proceeds with this case) or such other maximum amount as permitted by law, of the proceeds of this action or settlement of this action collected by the United States, plus an amount for reasonable expenses incurred, plus reasonable attorneys' fees and costs of this action. The Relators request that their percentage be based upon the total value recovered, including any amounts received from individuals or entities not parties to this action.

## B.      DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Respectfully submitted,

Complaint

Joe Griffith Law Firm, LLC

/s/ *Joseph P. Griffith, Jr.*
_____
Joseph P. Griffith, Jr., Esquire (Fed.I.D. #2473)
Seven State Street
Charleston, South Carolina  29401
(843) 225-5563 (tel)
(843) 722-6254 (fax)
joegriffithjr@hotmail.com
www.joegriffith.com

Richard M. Greene
(*Pro Hac Vice* motion forthcoming)
204 Muirs Chapel Road
Greensboro, NC 27410
Phone:  336-834-2600
Fax:    336-834-2646
atty4rev@aol.com

Kenneth R. McAllister
(*Pro Hac Vice* motion forthcoming)
201 Neal Place
High Point, NC 27262
Phone:  336-882-4300
Fax:    336-882-4306
kmcallister@mcallisterlawfirm.com,

*Counsel for the Plaintiffs/Relators*

Complaint

**SOUTH CAROLINA**

**VERIFICATION**

**COUNTY OF CHARLESTON**

I, Paige Purcell, being first duly sworn, depose and say:

I have read the foregoing and attached Complaint and know its contents; that the same is true of my own personal knowledge except those matters and things therein alleged upon information and belief, and as to those I am informed and verily believe them to be true.

_____
Paige Purcell

Subscribed and sworn to before me
This 21st day of June, 2013

_____
Notary Public

My Commission Expires: 4-30-20

Complaint

**SOUTH CAROLINA**

**COUNTY OF CHARLESTON**

                                        **VERIFICATION**

I, Alicia Strickland, being first duly sworn, depose and say:

I have read the foregoing and attached Complaint and know its contents; that the same is true of my own personal knowledge except those matters and things therein alleged upon information and belief, and as to those I am informed and verily believe them to be true.

                                        *Alicia Strickland*
                                        Alicia Strickland

Subscribed and sworn to before me
this 21st day of June, 2013

Notary Public

My Commission Expires: 11.30.20

Complaint